(Supreme Court, Appellate Division, Second Department. November 28, 1913.)

1. STREET RAILROADS (§ 12*)—ESTABLISHMENT—PERMISSION TO CONSTRUCT—REVIEW OF CONFIRMATION.

The action of the Appellate Division in confirming the determination of commissioners appointed to determine whether a subway railroad shall be constructed over a certain route, notwithstanding the want of consent of the majority of the property owners, acting under the Constitution, is final, and not reviewable by the Court of Appeals.

[Ed. Note.—For other cases, see Street Railroads, Cent. Dig. §§ 14, 19; Dec. Dig. § 12.*]

2. STREET RAILROADS (§ 10*)—ESTABLISHMENT—PUBLIC NECESSITY—NECESSITY OF SHOWING.

Notwithstanding that the Public Service Commission has laid out a route for the construction of a subway and the board of estimate and the mayor have formally approved such route, an applicant seeking to have the report of the commissioners confirmed on motion before the Appellate Division must affirmatively show a sufficient public necessity to have the road constructed over such route in order to overcome the protest of property owners.

[Ed. Note.—For other cases, see Street Railroads, Cent. Dig. §§ 15–19; Dec. Dig. § 10.*]

3. STREET RAILROADS (§ 10*)—ESTABLISHMENT—PROCEEDINGS—EVIDENCE.

Evidence, on a motion before the Appellate Division to confirm the report of commissioners recommending the construction of a proposed subway railroad route, *held* not to show a public necessity which would justify the establishment of such route, as against the protest of property owners.

[Ed. Note.—For other cases, see Street Railroads, Cent. Dig. §§ 15–19; Dec. Dig. § 10.*]

In re Utica Avenue Route. On motion to confirm report of the Commissioners recommending that the proposed subway shall be constructed over the route named. Motion denied, and matter referred to Commissioners for further proceedings.

See, also, 156 App. Div. 907, 141 N. Y. Supp. 1143.

Argued before JENKS, P. J., and THOMAS, CARR, STAPLETON, and PUTNAM, JJ.

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

George S. Coleman, Henry H. Whitman, and Edward M. Bassett, all of New York City, for the motion.

James F. Quigley, of Brooklyn, opposed.

PUTNAM, J.  The Public Service Commission has taken these proceedings to legalize the Utica avenue route which it had laid out under section 4 of the Rapid Transit Act.  This route, beginning northerly at Stuyvesant avenue and Kosciusko street, so as there to connect with another route already laid out (known as the Brooklyn, Manhattan and Long Island City route), is to run under Stuyvesant avenue as a subway to a point near Chauncey street, where it curves into Utica avenue and follows that avenue to a point near Crown street; it then comes out as an elevated structure extending southerly over Utica avenue to Flatbush avenue.  The proposed road is to be a four-track subway or tunnel down to a point between President street and Carroll; to the south of this it is to be but three tracks.  This route was approved by the board of estimate and apportionment on September 30, 1910, and on October 10, 1910, had also the separate approval of the mayor.  The abutting property owners along Stuyvesant avenue did not give the required consents, whereupon, on April 11, 1913, this court appointed commissioners to determine and report whether this proposed railroad ought to be built and operated.  On September 8th the commissioners united in an affirmative report which is the subject of the present motion to confirm.

The locality which is to be reached by this proposed route is now served by the Reid avenue trolley cars which, going over a double surface track on Utica avenue, turn at Fulton street into Reid avenue, and thence, going over the Williamsburgh Bridge, run to Delancey street, Manhattan.  The contract with the Interborough Rapid Transit Company, signed March 19, 1913, and now going forward, authorized a four-track subway along Eastern Parkway.  The route here projected is primarily to extend down into Rugby and Hyde Park, so as to connect that district with this Interborough trunk line along Eastern Parkway.  But as this connection may overfeed the Eastern Parkway line, it is also planned to run a three and four track subway northerly, across from Eastern Parkway, so as to connect with route No. 10 at Kosciusko street, to join the system already legalized, known as the Brooklyn, Manhattan and Long Island City route.

It is admitted that the actual building of this subway is in the remote future.  First the applicants seek their elevated line coming up from Rugby and running to the Eastern Parkway, which it is intimated may be built by assessment of the local beneficiaries.  When this feeder shall oversupply the Eastern Parkway line, the present proposed connection is to be constructed as an auxiliary outlet for the Rugby development.

The objections to this improvement are from the owners of Stuyvesant avenue, in the residential section between Gates avenue and Chauncey street.  This is a street shaded by large trees, where on both sides are high-class single family residences.  Stuyvesant avenue is 70

feet wide from building line to building line, and this four-track subway is planned for a width of 56 feet, so that with its walls it will approach the building structures, with the effect to destroy all the shade trees above. · Not only is this portion of the street a residential locality, but by chapter 434 of the Laws of 1895 the Legislature specifically excepted and prohibited surface, elevated, steam, or electric railways upon Stuyvesant avenue between Broadway and Fulton street. While this may not include subways, and it is argued that this exemption was repealed by implication in 1909, it shows that the Legislature then intended to secure the permanence of this part of the avenue for a residential district. Furthermore, it is shown that a stringent condition as to the residence character of the property appears in the conveyances of a considerable portion, forbidding the erection of buildings of any character, except a dwelling house arranged for the use of one family only. A large church property is also involved, which is also protesting against this invasion of the street.

While it is true that public necessity overrides private and personal rights, and that the temporary character of a neighborhood should not determine whether or not it shall be devoted to public needs, still the question here is sharply presented: Does such a public need exist as to justify the taking and occupation of this street against the protest of its residents? This is not a question of engineering construction or of the difficulties or the feasibility of operation, but the underlying test of the existence of a public necessity to justify this determination. The Constitution recognizes the right of a majority of the property owners to decide on such an added burden to the street. If, however, the consents be not given, then the Appellate Division of the Supreme Court is to appoint a commission to determine the question whether such a railroad ought to be constructed or operated, and their determination when confirmed by this court may supply the place of the consent of the property owners.

[1] The action of this court is final, and its discretion is not reviewable by the Court of Appeals. In the Matter, etc., of Kings Co. Elev. Ry. Co., 82 N. Y. 95, Judge Folger there said of this provision of the state compact:

"It is plain that a great evil was seen to exist, and a crying need of permanent and effective repression of it. That evil was the heedless and unneeded making of street railroads, to the harm of owners of adjacent property." 82 N. Y. 99.

See, also, Matter of Port Chester Street R. Co., 43 App. Div. 536, 60 N. Y. Supp. 160.

In considering the facts and circumstances, the court has to weigh and regard the public need that should justify the invasion of a residential street for subway purposes. Where the result is to expose the property owners to loss by depreciation, with their homes destined henceforth to be changed into a business occupancy, the injury is grave and vital. Ought these private losses and invasions of rights to be suffered, and the resistance of the property owners to give way to the public necessity that here appears?

It seems to have been felt that the action of the Public Service Commission in laying out the route was sufficient evidence of the public necessity therefor, and that after the approval by the board of estimate and by the mayor the public authorities had settled the question of public necessity against the private interests affected. Such a view would minimize the constitutional protection to property owners. Plainly the intent of the Constitution was that the commission and the court should determine, not only if the road was practicable and feasible to construct and operate, but whether, taking into account all the objections, such a road ought to be built, despite the protest of the property owners to be affected. The statement here is that this proposal of the Public Service Commission was duly advertised, but on the return day but one or two persons appeared, and the approval of the route by the board of estimate was practically unopposed. Naturally it was not until subsequently that consents of the property owners were sought, and then the situation was first before them.

[2] Notwithstanding the original laying out of route by the Public Service Commission and the formal approval by the board of estimate and the mayor, the applicant to this court to have such route legalized must affirmatively show a requisite public necessity to override the protests of the property owners. The power of supervision and review lodged in this court by the Constitution extends to every feature of the expediency and policy of the proposed route. Mr. Craven, the engineer called for the petitioners, admitted that he knew nothing of the considerations of public necessity which governed the commission in selecting this route, so that his testimony was confined to the engineering side of construction. Mr. Parsons also limited himself to the engineering problem presented. It was, however, brought out that the manager of Wood Harmon & Co., and other real estate operators, had been long urging an extension of the rapid transit system into this region of the Flatlands development. Wood Harmon & Co., by their powers of attorney from vendees of their lots, also by sending out agents, had procured many of the consents obtained. The advantages of building up this section, as yet partially unreached by transit facilities, are ably urged as a sufficient ground for establishing this transit route. However, there is no present design to build this road—at least through Stuyvesant avenue. Its legalization will be all, for perhaps a score of years, depending on the capacity of other transit systems and the financial resources of the city. Such a route when authorized will be an immediate cloud on the values of these property owners, however it may stimulate sales in the vacant property on Utica avenue.

[3] Upon consideration of the testimony, we think the facts shown fall short of proof of that public need which alone could warrant this invasion of a residential street with jeopardy of private rights. We are therefore constrained to deny the motion. In view, however, of this omission to introduce evidence as to the public need for this route, we think it should now be sent back to the same commissioners, to take such further proofs as may be offered as to the public necessity for this route.

Motion to confirm report of commissioners denied, and matter referred back to the commissioners to take such further proof as may be offered as to the public necessity of the route, in accordance with the opinion. Settle order before Mr. Justice PUTNAM. All concur.